docket number 20-1003. Thank you. And I understand we have Mr. Perez for the appellant. Mr. Perez, please proceed. May it please the Court and good morning. My name is Daniel Perez. I represent the defendant appellant Robert E. Gibeault, Jr. How is this, Judge Calabresi? Any better? I think we would ask, I understand it's a little difficult because we all have to wear masks today. You can raise the level of the podium. There's a little switch there and that will bring the microphone much closer to your face. So I apologize if maybe I'm going to ask everyone to just quite a bit into the microphone so we can all hear you. Judge Calabresi, is that better? Perfect. May it please the Court. My name is Daniel Perez. I represent the defendant appellant Robert E. Gibeault, Jr. pursuant to the Criminal Justice Act. I am delighted to be here in person for the first time in almost two years. We present essentially two arguments that proceed along parallel tracks and arrive at the same destination. The first is that there were two residences at the 321 Old West Lane Road address. The first belonging to Robert E. Gibeault, Sr. and his wife Jill Gibeault. And the second belonging to Robert E. Gibeault, Jr., my client. And the question there becomes whether that information was withheld from the magistrate judge when investigator Hamilton applied for a search warrant. Can one tell that there are two residences from looking at the house from the front? I'm sorry, Your Honor. Are you able to tell from looking at the house from the front that there are indeed two residences there? Or does it look like a one-family house? It looks like a standard residential house, Your Honor. It does. The second question that proceeds along a roughly parallel track is whether there were two Robert Gibeaults, or the fact that there were two Robert Gibeaults living inside that residence. But apart from everything else, didn't what Inspector Hamilton do meet whatever good test we have? You know, leave aside what one thinks of the exclusionary rule, leave aside of whether the warrant was too broad or whatnot. Didn't what this guy do meet good faith totally? And shouldn't we, just because the exclusionary rule is to deal with inspectors, police, whatever, who violate things, recognize when somebody does the best they can and then not apply it? Your Honor, the answer to the first question is no. The answer to the second question, of course, is yes. And I would beg the Court's indulgence and refer the Court to simply one page in the record. It's page 135 of the appendix. That is the second page. And if the Court would like, I'll give you a moment to locate that. That is the second page of the incident report. And the incident report on the second page, that's A135, in the narrative section at the top, says, while at State Police Wilton, a search warrant briefing was conducted by Agent Hamilton. And the last sentence in that paragraph says, Agent Hamilton identified the potential suspects as Robert Gibeault, year of birth 1939, and his son, Robert E. Gibeault, year of birth 1969. That briefing took place seven days after Investigator Hamilton, the same person who led this briefing, applied to the magistrate judge for a search warrant. And so the question becomes, and if you scour the search warrant application, there is no indication whatsoever that there are two Robert Gibeaults in that letter. I'm sorry. So you said this happened seven days afterwards? This is a briefing that took place the day that the warrant was executed. So, right. So seven days after the application was submitted to the judge? Yes, Your Honor. So how does that reflect that Inspector Hamilton knew this information seven days earlier? There had been six months of investigation prior to that point. There had been checks of post office records. I understand that. I'm saying, how does this demonstrate that this information was known seven days earlier? It's the same person. So again, this is why we asked you here. I'm the same person as I was seven days ago. Right. I know more today than I did seven days ago. Yes, I hope so. Possibly not. But I guess I don't understand how that proves something, that somebody said something seven days later, he must have known it seven days earlier. I don't think that's an ipso facto inference. So what is supporting your inference that he must have known it earlier? There is – well, what's supporting the inference that he must have known it earlier is the fact that there had been six months of investigation, multiple summonses to Internet providers, DMV records that didn't even – that evidently didn't show any – a Robert Chabot living at that address. But even if he knew there were two Robert Chabots and all that, before he actually went into Junior's apartment, he called back and said, is this okay? Doesn't that tell us something? What it tells the court is that he called – investigator Hamilton called the U.S. Attorney's office was not the issuing magistrate. But the agent wouldn't have called the magistrate directly, right? It was proper protocol to go through the AUSA to see whether there was an issue. I mean, doesn't that indicate the agent was acting in good faith? He didn't just go forward and do the search. He checked first. No. Actually, I view it the opposite. I draw the opposite conclusion, that the reason that the phone call was placed was precisely because they were confused. You would have preferred that he just went ahead and did the search without even checking with the prosecutor? No. Not at all. I would have preferred that the prosecutor contact the magistrate judge and say, we have two separate residences and two separate Robert Chabots, and a search warrant that comes with that. But the prosecutor chose not to do that. And wouldn't it be reasonable for the agent to then go forward, having gotten clearance from the prosecutor? My answer to that question, Your Honor, is no. That is not reasonable. And it would have been just as easy for someone, once they realized that they went into Robert Chabot's senior's home, and they realized that there was no access to Junior's home. They had to physically leave that home. But I thought there was just a sliding door separating the sunroom from the rest of the house. So what do you mean by no access? No. There was a sliding door that was blockaded. You could not access Junior's residence from senior's home. You had to physically leave the residence. It was blockaded by furniture, right? The furniture could have been moved aside? No. They actually tried to get through. The door was, there was a rod preventing the sliding door from being open. But apart from that, don't we have a very old case with Lerner and Hans Court, Suntory, which Jay Lefebvre, who has written the major book on that, and who is old enough that he was my classmate in law school, has described in a way that everybody takes it to say that if you go into a house that looks as though it's a one-family house, and then when you are there, only at that point you discover anything else. The warrant is still good. But Judge Talbrazy, that's not all they discovered. They discovered, they knew that there were two different Robert Chabot's on the day the warrant was executed. And somehow only seven days before, they withheld that information from the public. It should matter to these law enforcement officers that they establish probable cause to search Robert Chabot Jr.'s residence. Now look, I am very conscious of the need to protect people's privacy who, because they are poor, often because they're immigrants, because that's what happens, live somehow as a separate apartment in people's houses. Too many people who I've seen do that. So I'm conscious of wanting to do that. But I find it difficult to find that this case presents a problem in that sort of way. Again, my only response could be, after checking post office records, and I see my time is over, but after checking post office records, after checking post office records, it is as if Robert Chabot Jr. did not exist. And that is the reason why the district court should have at least held a hearing, because they clearly knew that there were two Robert Chabot's when they got to that house, and only seven days before, the only person referenced is a Robert Chabot, which clearly was the father. Okay. You've reserved three minutes, I believe, for rebuttal. Yes. Thank you, Your Honor. We'll see you again. Ms. Schoenberger? I may please the court, Karina Schoenberger for the United States. This case does not rise and fall on the characterization of Mr. Chabot Jr.'s residence. It depends on two questions. One, was there a valid warrant? And two, was that warrant reasonably executed? And the answer to both of those questions is yes. At the time that the warrant was applied for, there was every indication that this was a single-family home, and the magistrate found probable cause to search the entire home, including all of the rooms within it. And that was based on activity conducted by someone using an IP address that resolved back to an internet account. Was there any indication that even though this was seemingly a one-family home, that actually there was a separate—we can call it a granny flat, we can call it a people who come and help's flat, or in this case a child's flat—separate in that home? None, Your Honor. Not from any physical observation or from any of the records. There was never any sort of unit number assigned to the street address from either the internet account information, the utility records. There was nothing suggesting that there was anything other than one home. Was there any indication that would be available to the people seeking the warrant and so on that somebody was paying rent there? Nothing readily available that's obvious from the record, Your Honor. Thank you. And so the warrant was issued to search the entire house, and it was reasonable for the officers executing that warrant to search the entire house, including the room where Mr. Hebo Jr. lived. And your position is that if that is so at the outset, and that is what the warrant says, then when the officers, in this case Hamilton, get there, even though it then becomes—let's assume, I'm not saying it was so manifestly clear that there is a separate apartment—going into that is all right? In this particular case, yes, given the ambiguity about whether this was a separate living area, given the familial relationship between the two parties. So you leave open the possibility that even in that situation where before nothing was known, if you get there and you get clear indication that this is somebody else's place, maybe something should be done. What? Well, let's leave open. Certainly, Your Honor. A case like Maryland v. Garrison presents that type of scenario, where the officers enter and discover, indeed, that there are distinct separate apartments. But that's a different circumstance than we have here. And as Your Honor has already noted, that when the officers became aware that there was someone there protesting that the warrant didn't cover that area of the house, they did pause. They confirmed their belief with the AUSA that the warrant covered that particular area and only then proceeded with the warrant. And so even if the court were to find some sort of defect in the warrant or unreasonableness with its execution, the good faith exception to the exclusionary rule would certainly suggest that suppression here would be inappropriate. The officers relied on the warrant in good faith. There was no deliberate, reckless, grossly negligent conduct that would be deterred by applying the exclusionary rule here. Thank you. The district court's suppression decision should be affirmed. There was no error in deciding this case on the papers. Both sides had an opportunity to put evidence in front of the court. The court determined that a further hearing was not necessary, a completely reasonable conclusion given that there was no material facts that were even disputed by the parties. Unless there are any further questions. Thank you very much. Thank you, counsel. Mr. Perez, you have three minutes. Thank you. And I'm sorry that if I sound like I'm yelling, I'm trying to project. No, no. I probably sound like I'm yelling. Very helpful. There was a long and extensive investigation that started actively in May, okay? In May, there was a summons that was issued to the internet provider. That came back with Robert Chabot. June, there's a postal inspector. What would be the motivation for the agents not to say this is a multiple dwelling if they had known that? Your Honor, I can't speculate. I don't know. Well, I think the answer is there isn't a good reason, and they were acting in good faith, even assuming they were mistaken. Respectfully, Judge Chin, there have been many occasions on which law enforcement officers have acted unscrupulously or lied in the context of an investigation, and that is the function of the exclusionary rule, to guard people's privacy, to guard their homes against police abuses. Now, if you don't have a hearing, if you have six months of investigation, that somehow amounts to this man not even existing, and then in the week between the time that the warrant is issued and the time that they show up at the front door, the same investigator is saying, oh, we actually have a suspect. He's Robert Chabot, Jr. You shouldn't want to know how they found that out. But isn't this really something that would be contrary to their own interest? The search warrant listed the places and things to be searched and seized to include the persons of Mr. Chabot, Sr. and the mother, did not include the son. So presumably, if we want to indulge in the speculation that the target was really the son and they were trying to hide it from the magistrate judge, it runs counter to their because they did not list him as a person to be searched physically, you know, for, I don't know, USB flash drives or something or things. So I guess I don't understand the logic if we're hypothesizing that they secretly knew about the son and wanted to get into the house to search him, but then they purposely omitted him as a person to be searched in the warrant. I don't see how those two things match up. I don't know that I can go that far in suggesting that that's what happened, because the record doesn't support that. What the record supports is that there was, the warrant was directed to Robert Chabot, full stop. No, we hear you. But the question that the presider asks is why would they do that if they were trying, if they were doing something even negligently, carelessly, why would they do that? It's easier, Judge Calabresi. It's easier if you have the warrant. You just go in and you search. And police officers, like most people, try to pursue the path of least resistance. It's much easier to simply say there's a Robert Chabot at this address. Leave out the fact that there's two residences. Leave out the fact that there's, one is 7 years old and one is 40 years old. And leave it, leave it nice and clean. And you get in there and you just conduct your search. Thank you. Thank you very much. Thank you both for the argument. We will reserve decision. Thank you. Thank you.